# EXHIBIT A



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

PAMELA LEVINSON
    Vs.                                     C.A. No.       2013 CA 000515 B

WILMER CUTLER PICKERING HALE AND DORR LLP
## INITIAL ORDER AND ADDENDUM

       Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

       (1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

       (2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

       (3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

       (4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

       (5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

       (6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                               Chief Judge Lee F. Satterfield

Case Assigned to:  Judge JOHN M MOTT
Date:  January 24, 2013
Initial Conference: 10:00 am, Friday, April 26, 2013
Location:  Courtroom 221
                500 Indiana Avenue N.W.
                WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Pamela Levinson
_____
                          Plaintiff

                    vs.                                    Case Number **13 - 0000515**

~~Witmer Hate  LLP~~ Wilmer Cutler Pickering Hale and Dorr, LLP
_____
                         Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

David Sanford
Name of Plaintiff's Attorney                          Clerk of the Court

1666 Connecticut Ave NW Suite 300      By _____
Address                                                    Deputy Clerk
Washington, DC 20009

(202) 499-5200                            Date 1/24/13
Telephone

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Dê có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español!

SUPERIOR COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

RECEIVED
Civil Clerk's Office
JAN 2 4 2013
Superior ...
District of Columbia
Washington, C

PAMELA LEVINSON
5801 Bradley Blvd.
Bethesda, MD 20814
(301) 758-4180

    **Plaintiff**,

    v.

WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000

    **Defendant**.

Civil Action No. 13 - 0 0 0 0 5 1 5

**COMPLAINT**

**Jury Trial Demanded**

## OVERVIEW

1.    Plaintiff Pamela Levinson ("Plaintiff" or "Ms. Levinson") brings this action against Defendant law firm Wilmer Cutler Pickering Hale and Dorr LLP ("Defendant" or "WilmerHale" or "the Firm") to redress deprivation and interference of rights secured by the District of Columbia Family and Medical Leave Act, D.C. Code §§ 32-501 et seq. ("DCFMLA"), the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 et seq. ("DCHRA"), and related common law.

2.    Ms. Levinson's work was characterized as "excellent" and "impressive" during her seven years of service to WilmerHale. Despite that fact, Ms. Levinson was terminated by Defendant while on protected adoption leave, and denied salary increases and bonuses commensurate with the level of her performance.

3.    WilmerHale's proffered reasons for terminating Ms. Levinson are pretextual as

1

evidenced by the timing of her termination and WilmerHale's disregard of Ms. Levinson's impressive record throughout her employment with Defendant.

4.      WilmerHale actually terminated Ms. Levinson because she exercised her right to take protected adoption leave and because of her gender, age and family responsibilities.

5.      Furthermore, WilmerHale denied Ms. Levinson salary increases and adequate bonuses because of her gender, age and family responsibilities.

6.      In addition, Ms. Levinson was denied profit-sharing contributions in 2011 and 2012 promised under the Firm's retirement plan, which WilmerHale changed without Ms. Levinson's notice, rendering her ineligible for the contributions.

## JURISDICTION

7.      This Court has subject-matter jurisdiction over Ms. Levinson's claims pursuant to D.C. Code § 11-921.

8.      This Court may exercise personal jurisdiction over WilmerHale pursuant to D.C. Code § 13-423.

9.      WilmerHale transacts business in the District of Columbia.

10.     Ms. Levinson was an employee of WilmerHale in the District of Columbia at the time that she was denied her rightful compensation.  WilmerHale wrongfully terminated Ms. Levinson while she was on protected leave.

## THE PARTIES

11.     Ms. Levinson is a 53-year-old female currently residing at 5801 Bradley Boulevard, Bethesda, Maryland 20814.  WilmerHale hired Ms. Levinson in September 2004. Ms. Levinson took four and a half months of adoption/maternity leave to adopt a 22 month-old child from China beginning December 9, 2011.  WilmerHale terminated Ms. Levinson in February 2012.

2

12.    Ms. Levinson was at all relevant times an eligible employee of WilmerHale within the meaning of the DCFMLA and the DCHRA.

13.    WilmerHale is a law firm with over 1,000 lawyers and 12 offices in the United States, Europe and Asia.  WilmerHale is an employer within the meaning of the DCFMLA and the DCHRA and has a principal place of business at 1875 Pennsylvania Avenue, NW, Washington, DC 20006.

## FACTS

### I.    MS. LEVINSON'S BACKGROUND

14.    Throughout her adult life, Ms. Levinson has consistently excelled in her endeavors both academically and professionally.  After achieving high academic honors in high school, Ms. Levinson continued at Macalester College, graduating in 1981, magna cum laude with a Bachelor of Arts degree in Sociology.

15.    After college, Ms. Levinson worked as a fundraiser for a non-profit organization, was Executive Vice President of an international film distribution company, and ran her own businesses in home construction and antiques.

16.    In 1998, Ms. Levinson attended the University of Miami School of Law, graduating first in her class summa cum laude in 2001.  As a result, she earned membership in the school's chapter of the Order of the Coif.  During law school, Ms. Levinson was a member of the *University of Miami Law Review* and the recipient of numerous book awards.

17.    Upon graduating from law school, Ms. Levinson served as a law clerk to the Honorable Adalberto Jordan of the US District Court of the Southern District of Florida (now a judge of the United States Court of Appeals for the 11th Circuit).  After

completing her clerkship, Ms. Levinson spent nearly two years as an associate in the Miami offices of the law firm, Akerman Senterfitt, LLP.

## II.    MS. LEVINSON'S IMPRESSIVE PERFORMANCE RECORD AT WILMERHALE

18.    Ms. Levinson transitioned to WilmerHale in September 2004, where she assumed the title of fourth-year associate.  Ms. Levinson was 45-years-old when she began her employment with WilmerHale.

19.    As with all attorneys who joined WilmerHale, Ms. Levinson participated in the "New Associates Working Group," a training program comprised of lectures, seminars, and workshops aimed at exposing attorneys to the foundational aspects of the profession of law.  Ms. Levinson graduated from the training program in May 2005.  Throughout her tenure in the program, Ms. Levinson received predominantly positive performance reviews from her program evaluators.  One midpoint evaluator, Ted Millspaugh, described Ms. Levinson as "great – very diligent and helpful, both on the research side and the advice side."  Colin Rushing evaluated Ms. Levinson at graduation and stated that he was "very impressed" with her, citing how she "jumps right into cases, rolls up her sleeves, and is quite organized. . . . [S]he really went the extra mile in less than ideal circumstances."

20.    In 2006, WilmerHale placed Ms. Levinson on the Novartis-Trileptal Investigation team.  As part of her spring 2006 mid-year review, Ms. Levinson received "solid to high marks from all evaluators."  One evaluator, Karen Green ("Ms. Green"), commented that she was "impressed with [Ms. Levinson's] initiative, analytical abilities, and drive."  Ms. Levinson's fall 2006 reviews were similarly positive.  Lillian Potter stated in her evaluation that Ms. Levinson "did an excellent job all around . . . She was prepared, organized, thorough, and really helped us in a tight spot."  The evaluating partners recommended that Ms. Levinson be

given more responsibility and opportunities to build her legal repertoire, including "the opportunity to take on more senior responsibility for litigation tasks; she clearly can handle it."

21.    The following year, Ms. Levinson's spring 2007 evaluations were "laced with superlatives, describing her work as 'excellent,' 'very impressive,' and 'top-quality.' Partners and counsel praised [Ms. Levinson's] diligence, hard work, communication skills and initiative." Ms. Levinson's fall 2007 evaluators applauded her as a "critical member" of the Novartis-Trileptal team as a result of her successful supervision of staff attorneys and paralegals, "extremely good" memo writing, and competence in document oversight. Ms. Levinson "earned the gratitude and respect of the lawyers with whom she work[ed]."

22.    In recognition of her "hard work and many contributions to the work of the firm," WilmerHale promoted Ms. Levinson from associate to counsel on January 1, 2008.

23.    As counsel, Ms. Levinson continued to manage the large document review and production team on the Novartis-Trileptal matter for the Investigations and Criminal Litigation Group ("ICL"). Her mentor, Randolph Moss ("Mr. Moss"), summarized her 2008 spring evaluations and stated that Ms. Levinson did an "extraordinary job managing the document production process." She "developed a thoroughgoing grasp of the key issues," made "invaluable contributions," demonstrated "strong interpersonal skills," and had "well-organized, clear, and concise" written work. Reviewing partners continued to recommend that Ms. Levinson acquire even more experience and assume leadership roles.

24.    In the fall of 2008, Ms. Levinson received a Partnership Prospects Evaluation. Despite the fact that a partner recommended her to be promoted to partner, her male mentor, Mr. Moss, revealed in the evaluation that Ms. Levinson would not be considered for partnership despite the fact that she "excelled in [her] position."

25.    Despite receiving this unexpected and disheartening news, Ms. Levinson continued to push forward, performing just as well if not better in 2009.  Ms. Levinson's 2009 spring and fall evaluations were unanimously positive.  The evaluations noted that Ms. Levinson was "highly responsive and efficient" and "consistently added value to the work of the team." One partner, Emily Schulman, noted that Ms. Levinson "could not be more responsive, diligent, efficient or productive."  Another partner, Ms. Green, stated that Ms. Levinson had "met all of my expectations for a lawyer of her seniority."  All three of Ms. Levinson's reviewing partners recommended her for promotion to Special Counsel.

26.    Despite these recommendations, WilmerHale did not promote Ms. Levinson to Special Counsel.  Instead, in direct contravention of her reviewing partners' recommendations, Defendant told Ms. Levinson that her long term prospects at the Firm were limited, froze her base salary and reduced her bonus award to $0 following her 2009 performance.

27.    Although WilmerHale had numerous partner promotions during Ms. Levinson's tenure, upon information and belief, there has only been one female attorney promoted to partner while over the age of 50 during the relevant time period.  In fact, the vast majority of individuals promoted to partner and/or Special Counsel were below the age of 40 at the time of their promotion and there has not been a single instance in which a person over the age of 50 was promoted to Special Counsel in the litigation department.

28.    In her 2010 mid-year reviews, Ms. Levinson received "very good" evaluations and was praised for her commitment, dedication, and attention to detail.  Of particular importance, her management skills were described as "exemplary."  Ms. Levinson was also recognized for her "excellent leadership skills" and "the degree to which she was willing to recognize the contributions of the associates working for her."  Four of five evaluating partners recommended Ms. Levinson for promotion to Special Counsel based on her performance,

commending her "management of the team and the work and her development of strategy." The only evaluating partner who did not make such a recommendation was one who had only worked with Ms. Levinson minimally on a pro bono project. Nonetheless, WilmerHale informed Ms. Levinson that her future prospects at the Firm were "not promising."

29.     In her 2010 year-end reviews, WilmerHale continued to praise Ms. Levinson for her commitment to her matters and clients and for being an excellent case manager. WilmerHale gave Ms. Levinson positive feedback for her leadership and mentoring of associates and the Firm recognized her for having taken a "keen interest" in their development. Despite these recommendations, WilmerHale declined to promote Ms. Levinson to Special Counsel for a second straight year and maintained a freeze on her base salary.

30.     In late 2010, WilmerHale assigned Ms. Levinson to a pharmaceutical off-label marketing matter due to her significant experience in the subject area. The partner overseeing the matter, who had worked with her previously, mentioned that he was excited to have Ms. Levinson on the case.

31.     However, Ms. Levinson was informed by the practice manager who had originally assigned Ms. Levinson to the new matter that she had been removed from the assignment. The practice manager told Ms. Levinson that she understood that Steve Jonas, head of the ICL group, was "trying to get rid of" Ms. Levinson and wanted to employ the assistance of someone other than Ms. Levinson who actually had a "future at the firm." Subsequently, WilmerHale replaced Ms. Levinson on the matter with a female attorney in her early thirties, who was based out of the Boston office.

32.     In February 2011, Ms. Levinson began reporting to male partner Matthew Holmwood ("Mr. Holmwood"), who discounted her achievements and excluded her from important meetings.   Ms. Levinson was one of the few managing attorneys on the team, yet

during a full team meeting, Mr. Holmwood directed associates, paralegals and other staff to report only to him, male partner Russell Bruemer and male counsel Michael Vagnucci.

33.    Ms. Levinson was not the only female on the team to be discounted because of her gender. When a colleague of hers prepared to leave Switzerland after her first trip working with the team, she expressed to Ms. Levinson her reluctance to return to the team because of the treatment that she had received from male leadership. Despite working under less-than-ideal circumstances, Ms. Levinson earned a good mid-year evaluation in April of 2011 from Mr. Holmwood, which commended her "terrific organizational skills, commitment, thoroughness, and focus on client goals." The overall assessment for Ms. Levinson was "Performance at a High Level."

### III.    MS. LEVINSON TAKES PROTECTED ADOPTION LEAVE AND RECEIVES A REDUCED BONUS AWARD WHILE ON LEAVE

34.    In fall 2011, Ms. Levinson prepared to adopt a 22 month-old child from China. She notified WilmerHale's human resources department in October 2011 that she would be taking adoption leave in December. WilmerHale provides 4.5 months of paid adoption leave, equivalent to its maternity leave policy. WilmerHale's adoption leave policy states that the Firm does not expect a leave of the full 18 week allotment to affect advancement. The paid adoption leave was scheduled to end on April 16, 2012 and Ms. Levinson planned on returning to work shortly following her leave.

35.    Ms. Levinson began her adoption leave on December 9, 2011. While out on adoption leave, Ms. Levinson's mentor-partner never contacted her about year-end evaluations, despite it being common practice for mentors to do so.

36.    In January 2012 while still on leave, Ms. Levinson learned that her 2011 bonus had been reduced to $22,000. Ms. Levinson calculated that she should have received a bonus of

approximately $35,000 to $50,000 after her billable hours were annualized and prorated to account for her adoption leave.

### IV.   MS. LEVINSON IS TERMINATED WHILE ON ADOPTION LEAVE

37.     In approximately January 2012, Ms. Levinson received an email advising individuals who were out of the office when bonus letters were distributed to collect their bonus letters from human resources.  Ms. Levinson returned to WilmerHale's office with her adopted daughter to pick up her bonus letter in February 2012.  While she was at the office, a human resources secretary directed Ms. Levinson to retrieve her letter from Craig Goldblatt ("Mr. Goldblatt"), who was known at WilmerHale for delivering career-altering news to attorneys. When Ms. Levinson arrived at Mr. Goldblatt's office, he handed her her bonus letter and her 2011 year-end evaluation.  Mr. Goldblatt stated that Ms. Levinson would not understand her bonus without the evaluation.  After handing Ms. Levinson the evaluation, Mr. Goldblatt terminated Ms. Levinson, informing her that she would be expected to "transition to another job."

### V.   WITHOUT NOTICE TO MS. LEVINSON, WILMERHALE UNILATERALLY AMENDS ITS RETIREMENT PLAN RENDERING MS. LEVINSON INELIGIBLE FOR PROFIT-SHARING CONTRIBUTIONS

38.     Along with having her salary frozen and her bonus reduced, Ms. Levinson also discovered in or around the same time (i.e., early 2012) that she did not receive a profit-sharing contribution to her 401(k) retirement account following both the 2010 calendar year and the 2011 calendar year, as promised under WilmerHale's retirement plan.

39.     WilmerHale's 2006 retirement plan states that for each plan year, WilmerHale shall contribute to an eligible employee's 401(k) account an amount equal to 5% of the eligible employee's compensation.   The plan states that for the purposes of the profit-sharing

contribution, an "eligible employee" includes any employee that is not an associate or lockstep counsel.

40.     It was the policy of WilmerHale to advance an associate to lockstep counsel after her sixth year at the associate level.  After two years as lockstep counsel, an attorney would either become non-lockstep counsel or be promoted to partner.  Ms. Levinson became lockstep counsel effective January 1, 2008, and non-lockstep counsel effective January 1, 2010, thus making her eligible to receive her first profit-sharing contribution after the 2010 calendar year.  According to WilmerHale's retirement plan, Ms. Levinson should have received a 5% contribution of her 2010 and 2011 salaries, respectively, to her 401(k) plan.

41.     The 2007 amendment to WilmerHale's retirement plan similarly promised non-lockstep counsel a profit-sharing contribution of 5% of their annual compensation.  The plan also stated that if WilmerHale amended the plan, participants would receive written notice of any amendment the employer adopted if that amendment affected the participants' benefits under the plan.

42.     In 2011, the year in which Ms. Levinson should have received the first profit-sharing contribution to her 401(K) account, WilmerHale unilaterally amended the retirement plan, changing the definition of counsel eligible to receive a profit-sharing contribution to include only Special Counsel and those employees deemed 4th year-and-above counsel as of December 31, 2010.  Ms. Levinson became a 4th year counsel the very next day on January 1, 2011.  However, as a third-year counsel on the date designated by WilmerHale, Ms. Levinson was rendered ineligible for the profit-sharing contribution.  In clear violation of the 2007 retirement plan, Ms. Levinson was never notified about the 2011 amendment.

43.     In sum, despite her strong performance while at WilmerHale, Ms. Levinson had her base salary frozen in 2009, her bonuses reduced thereafter and promotions for which she

was recommended denied because of her gender and age. WilmerHale's discriminatory treatment of Ms. Levinson culminated in her termination while on protected leave in violation of District of Columbia law. In addition, WilmerHale failed to pay into Ms. Levinson's 401(k) retirement account two separate profit-sharing contributions pursuant to the terms of the firm's 2006/2007 retirement plan, which were unilaterally changed without notice to Ms. Levinson to make her ineligible for such a contribution. The impact of WilmerHale's deliberate and reckless conduct against Ms. Levinson is substantial. Ms. Levinson is now unemployed shortly after bringing a new child into her family. WilmerHale's actions have caused clear economic harm to Ms. Levinson and substantial emotional damage.

## COUNT I – DISTRICT OF COLUMBIA FAMILY AND MEDICAL LEAVE ACT DISCRIMINATION

44.     Plaintiff incorporates and realleges paragraphs 1 through 43 of the Complaint as if fully set forth herein.

45.     By requesting and taking DCFMLA leave, Plaintiff availed herself of protected rights under the DCFMLA, including the right to be returned to the same or equivalent employment position after returning from leave (i.e., equivalent employment benefits, pay, seniority, and other terms and conditions of employment).

46.     Despite her history of positive job performance, in February 2012, shortly after going on protected leave in December 2011, Plaintiff received a markedly negative performance review for the first time, which resulted in a reduction in her bonus. Defendant used this review as a pretext to terminate Plaintiff while she was on protected leave. Defendant's conduct constituted unlawful discrimination in violation of the DCFMLA.

47.     There is a causal connection between Plaintiff's taking protected DCFMLA leave and Defendant's discrimination against and termination of Plaintiff. Because of the temporal

proximity between Plaintiff's negative performance review, the reduction in her bonus, her termination and her protected leave, Defendant's adverse actions against Plaintiff occurred under circumstances that give rise to an inference of unlawful discrimination.

48.     Defendant's actions were willful, wanton, and undertaken with reckless disregard and indifference to the rights of Plaintiff.

49.     As a direct and proximate result of said intentional acts, Plaintiff is entitled to all legal and equitable relief available under District of Columbia law, including damages related to loss of employment, loss of income, loss of other employment benefits, emotional distress, humiliation, embarrassment, and damage to her reputation.

## COUNT II – DISTRICT OF COLUMBIA FAMILY AND MEDICAL LEAVE ACT RETALIATION

50.     Plaintiff incorporates and realleges paragraphs 1 through 49 of the Complaint as if fully set forth herein.

51.     By requesting and taking DCFMLA leave, Plaintiff availed herself of protected rights under the DCFMLA, including the right to be returned to the same or equivalent employment position after returning from leave (i.e., equivalent employment benefits, pay, seniority, and other terms and conditions of employment).

52.     Despite her history of positive job performance, in February 2012, shortly after going on protected leave in December 2011, Defendant gave Plaintiff a negative performance review, reduced her bonus, and then terminated her because she exercised her statutory right to take protected leave. Defendant's conduct constituted unlawful retaliatory discharge in violation of the DCFMLA.

53.     There is a causal connection between Plaintiff's taking protected DCFMLA leave and Defendant's negative performance review, reduction of Plaintiff's bonus, and termination of Plaintiff. Because of the temporal proximity between Plaintiff's negative performance review,

the reduction of her bonus, her termination and her protected leave, Defendant's adverse actions against Plaintiff occurred under circumstances that give rise to an inference of unlawful retaliation.

54.     Defendant's actions were willful, wanton, and undertaken with reckless disregard and indifference to the rights of Plaintiff.

55.     As a direct and proximate result of said intentional acts, Plaintiff is entitled to all legal and equitable relief available under District of Columbia law, including damages related to loss of employment, loss of income, loss of other employment benefits, emotional distress, humiliation, embarrassment, and damage to her reputation.

<u>**COUNT III - DISTRICT OF COLUMBIA HUMAN RIGHTS ACT DISCRIMINATION**</u>

56.     Plaintiff incorporates and realleges paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57.     Defendant intentionally discriminated against Plaintiff in violation of the DCHRA by refusing to promote her to special counsel or partner, freezing her salary, and reducing her annual bonus payments because of her age, sex and family responsibilities. Although counsel at WilmerHale are eligible for promotion to special counsel after two years, Plaintiff was not promoted despite working as counsel for just over four years and receiving multiple recommendations from her evaluating partners that she should be promoted.

58.     Defendant also intentionally discriminated against Plaintiff in violation of the DCHRA by giving her a negative performance review, which resulted in a reduction of her bonus, because of her age, sex and family responsibilities, and then using that performance review as a pretext to terminate her.